**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-10-1126-PHX-GMS |
| Plaintiff, | **ORDER** |
| vs. | |
| Manuel Martin Garcia-7, et al., | |
| Defendant. | |

Pending before the Court is Manuel Martin Garcia's Motion to Suppress Wiretap Evidence (Doc. 229), in which Defendants Nina Celeya-Troncoza (Doc. 258), John Kweku Eshun (Doc. 301), Kathy Ann Valenzuela (Doc. 352), David Troncoza (Doc. 366), Jonathan Troncoza (Doc. 387), Shawn Holloway (Doc. 473) and Edward Christopher Morales (Doc. 484) have joined. For the following reasons, the motion is denied.

**BACKGROUND**

On February 10, 2009, the government filed its Application for Initial Interception of Wire Communications in this case with the Hon. David G. Campbell. The application sought to intercept the communications of Jonathon Ortiz Troncoza on a cellular telephone used by him that was designated as target telephone #1 (hereafter "TT1"). The application was based upon the affidavit of Special Agent Jason Dziedzic that was attached. In the affidavit, SA Dziedzic avowed to facts that he asserted established probable cause to believe that Jonathon

Troncoza, as well as some other identified and unidentified persons, were engaged in various drug-trafficking crimes set forth in the affidavit, and that "the particular wire communications of J. Troncoza and others yet unknown to and from TT1" would concern those offenses and provide additional information concerning the identities, roles, specific activities, manner and locations at which the trafficking was being conducted.

Specifically with respect to Jonathan Troncoza the affidavit avowed that he had been the subject of DEA investigations since 2001. In March 2005, he traveled from Ohio to Arizona and was detained here. He provided statements to officers about his travel itinerary that were inconsistent with his known travels. He then declined further to speak with the officers. The execution of a search warrant for the two pieces of luggage Troncoza and a companion were carrying revealed that the suitcases contained $181,790 in U.S. currency. Troncoza denied knowledge of the money.

In a follow-up investigation the Cleveland office of the DEA found that Jonathan Troncoza was listed as an officer for a company called El Conquistador LLC. Agents discovered that there were several financial accounts linked to Jonathan Troncoza and El Conquistador LLC that had significant evidence of the structuring of cash deposits to avoid financial reporting requirements. They further found that Mr. Troncoza used a fictitious identity to set up and operate El Conquistador, and that Mr. Troncoza was also affiliated by his financial transactions, with two other businesses–Sea of Cortez Produce & Distribution Inc. and Mt. Freight.

In 2007 the Houston DEA Field Division opened an investigation that included Mr. Troncoza. A confidential source indicated that on two separate occasions in September 2008, he was directed by the suspected leader of a Mexican drug trafficking organization to pick up U.S. currency from Mr. Troncoza, and that Mr. Troncoza had told him that the currency amounts were drug proceeds . This same confidential source identified members of a drug-trafficking organization operated by Troncoza and in August 2008, the confidential source supplied Jonathan Troncoza's prior telephone number to agents and indicated that it was the number used by Jonathan Troncoza in communication with the confidential source to direct

the confidential source to transport $600,000 in drug proceeds for the alleged Troncoza DTO from Cleveland, Ohio to Mesa, Arizona and $200,000 in drug proceeds from Atlanta, Georgia to Mesa.

In 2008, DEA task force agents in Phoenix began investigating a drug-trafficking organization run by Joy Doreen Watson. Pursuant to that investigation DEA agents executed five search warrants on five residences, seized five vehicles, three handguns and approximately 440 pounds of marijuana. A financial investigation of members of the Watson DTO demonsrated three accounts into which Joy Watson deposited U.S. currency. Those accounts were in the name of Jonathan Troncoza, Drusilla Troncoza and Sea of Cortez Produce & Distribution Inc.

In December of 2008 police in the Detroit area stopped a semi-tractor and trailer marked Mt. Freight with an Arizona registration. The officer conducting the stop detected a strong odor of air freshener inside the cab and as a result asked to inspect the truck and trailer. Although a narcotics detector dog alerted on the exterior passenger side of the tractor trailer and the front left sidewall of the trailer, the trailer was only found to contain two pallets of shrimp from Sea of Cortez Produce and Distribution Inc, and no drugs or drug proceeds. A review of the records from Jonathan Troncoza's prior phone revealed that he received three telephone calls at or about the time that the truck was detained by Detroit police.

In January 2009 the confidential source obtained the new telephone number of Jonathan Troncoza and called him on that telephone line. That telephone line was TT1. A toll analysis of TT1 established that it was used twice to contact a telephone number which the confidential source identified as the leader of a Mexican drug-trafficking organization, and a large supplier for the Troncoza DTO and other unidentified individuals. TT1 was also used in December 2008 to contact a telephone number that was intercepted pursuant to a wiretap on another phone. In the course of the intercepted calls on the other wiretap, the phone that was contacted by TT1 was used to discuss the narcotic business numerous times with the user of the phone that was subject to the second wiretap. Between November 2008

and January 2009 TT1 was used approximately 26 times to contact David Troncoza. The cooperating Defendant indicated that Jonathan Troncoza introduced his brother David to the cooperating Defendant as a drug-trafficking associate of his.

Between November 2008 and January 2009 TT1 was used to contact seven different numbers in Mexico 105 times, and in the last two weeks of 2008 TT1 was used five times to contact a number used by Edgardo Ahumada-Suarez. Due to a separate DEA investigation of Edgardo Ahumada-Suarez, the DEA was aware that in January 2009 Ahumada-Suarez was attempting to transport a large quantity of marijuana from Mexico to Arizona. In the last two weeks of 2009 TT1 was also used to contact a number thirty times. Although the identity of the user of that phone is unknown, the same phone number was contacted by Bianey Maldonado, who was arrested for cocaine conspiracy in September 2008 by DEA in Atlanta. The phone line contacted by TT1 was identified in Maldonado's phone as belonging to Checo (last name unknown). The confidential source identifies Atlanta as a key distribution point for the Troncoza DTO.

In addition to the information provided by the confidential source above, a cooperating defendant, who was charged with narcotics violations in the District of Arizona in 2008, provided information to investigators that Jonathan Troncoza was his/her source of supply for marijuana. The cooperating defendant further told investigators that he/she had deposited approximately $200,000 in U.S. currency into various accounts to pay Jonathan Troncoza. Three of those accounts were determined to be in the names of Jonathan Troncoza, Drusilla Troncoza and Sea of Cortez Produce & Distribution Inc. The cooperating defendant further identified David Troncoza as the brother of Jonathan Troncoza and his associate in the DTO. The cooperating defendant met the Troncoza brothers in 2006 at a stash house in Phoenix, and Jonathan Troncoza had solicited the cooperating defendant to provide him with female drivers to drive large amounts of marijuana in sport utility vehicles over from Mexico and into the United States. The cooperating defendant further specified that Jonathan Troncoza owned a seafood company and that he would use the refrigerated semi-trailers of that company and their loads as a cover to smuggle marijuana and cocaine

into the United States.

In his affidavit, and in the follow-up affidavits used to extend the wiretap, Special Agent Dziedzic stated that the cooperating defendant "has pled guilty to narcotic charges and she is currently incarcerated." He further states that "[t]he CD is cooperating with law enforcement in hopes of receiving consideration at sentencing; however, no promises have been made to the CD."

Based on the information provided in the affidavit a wiretap was authorized and extended.

Defendants, however, have moved to suppress any information gleaned during the wiretap, or in which the wiretap resulted because in both SA Dziedzic's initial affidavit, and his subsequent application to extend the wiretap, he provided false information with respect to the cooperating defendant. The facts are that the cooperating defendant was charged by indictment with drug trafficking on March 27, 2008. The cooperating defendant initially indicated a willingness to cooperate with law enforcement and signed a proffer/interview agreement. The cooperating defendant was debriefed on August 6, and August 26, 2008. Both debriefings resulted in DEA-6, Reports of Investigation. The cooperating defendant was expected to enter a cooperation plea agreement, but never did so. Instead the cooperating defendant indicated prior to the scheduled trial that he/she would proceed to trial on the charges against him/her without further cooperation or without entering into a cooperation plea agreement. The cooperating defendant was tried and convicted on money laundering charges on April 23, 2009 and sentenced on August 13, 2009. At her sentencing the cooperating defendant requested that the Court take into account her period of cooperation with the government.

The United States acknowledges that, despite the contents of the Dziedzic affidavit, at the time that the application for wiretap was filed on February 10, 2009, the cooperating defendant was no longer cooperating with the government, nor had she pled guilty to narcotic charges. But, the United States asserts, in all other respects the material contained in the affidavit about the cooperating defendant was accurate: (1) the CD had provided information

to law enforcement as of August 2006; (2) the information provided was reliable and corroborated by subsequent investigation; (3) the CD was not paid by law enforcement; (4) the CD had been charged with narcotics violations in 2008; (5) the CD was incarcerated; (6) the CD had cooperated in the hopes of receiving consideration at sentencing; and, (7) no promises had been made to the CD about her cooperation.

Garcia bases his motion to suppress on the assertion that considered with the correct information, the Dziedzic affidavit fails to establish probable cause that TT1 was being used for drug trafficking. He further alleges that a wiretap was not necessary to conduct the investigation because at one of the locations in North Las Vegas in which Troncoza resided, Google Earth images suggests that it would have been possible to place a pole camera to observe the residence. In either circumstance he asserts, the wiretap was invalid and the information obtained as a result of the wiretap should be suppressed.

**I.    Defendants Have Not Established the Requirements for a *Franks* Hearing**

A defendant may obtain a *Franks* hearing to cross-examine the Affiant and explore inaccuracies in the application for warrant. Such a hearing is appropriate on a substantial showing of intentional or reckless false statements or omissions that are material to a finding of probable cause. *United States v. Meling,* 47 F.3d 1546, 1553 (9th Cir. 1995) (affirming the denial of a *Franks* hearing). An inaccurate inclusion or an omission that relates to the credibility of a confidential informant is not material unless the affidavit, purged of its defects, would not be sufficient to support a finding of probable cause or necessity. *United States v. Bennett,* 219 F.3d 1117, 1124 (9th Cir. 2000) (affirming the denial of a *Franks* hearing where the government omitted instances of perjury of its informant). The defendant "bears the burden of proof and must make a substantial showing to support both elements." *United States v. Chavez-Miranda,* 306 F.3d 973, 979 (9th Cir. 2002). If the defendant fails to make a substantial preliminary showing of either intentional or reckless inclusion or omission, or materiality, the district court should not conduct a *Franks* hearing. See *United States v. Shryock,* 342 F.3d 948, 976-77 (9th Cir. 2003); *Bennett,* 219 F.3d at 1124-25 (proper to refuse *Franks* hearing where defendant satisfied recklessness requirement but did

not show materiality).

Defendants are entitled neither to a *Franks* hearing nor to the suppression of evidence resulting from the wiretap because, purging the affidavit of all of its defects and supplying its omissions, there still was sufficient information disclosed to establish probable cause that Jonathan Troncoza was using TT1 in the pursuit of drug-trafficking. Probable cause requires only a reasonable belief that a subject has committed a crime, which reflects a balance between the privacy interests of individuals and a community's need for protection from criminal activity. *Maryland v. Pringle,* 540 U.S. 366, 371 (2003). The standard is the same as that required for a search warrant, an arrest warrant, or an indictment. *See United States v. Thom,* 960 F.2d 1391, 1395 (9th Cir. 1992).

As detailed in the affidavit, the confidential source, not the cooperating defendant, had direct dealings with Jonathan Troncoza and stated to investigators that he transported currency on behalf of the Troncoza DTO that was admitted by Troncoza to be drug proceeds. Information supplied by the confidential source to the DEA had been independently verified. The confidential source provided law enforcement with Troncoza's TT1 phone number, placed a phone call to Troncoza on that number and discussed what appear to be drug proceeds on that phone call. A toll analysis conducted on that phone number demonstrates that the phone was used to call various persons who were otherwise under investigation for trafficking in drugs including: (1) the purported leader of a Mexican DTO used to supply Troncoza, (2) frequent calls to a phone number that was called by the user of a different phone line subject to a wiretap in which drug trafficking was frequently discussed; (3) a line in the name of Edgardo Ahumada-Suarez who was apparently involved in seeking to smuggle drugs into the United States in January 2009; (4) Checo (last name unknown) an Atlanta phone number that was contacted by Bianey Maldonado, who was arrested for cocaine conspiracy in September 2008 by DEA in Atlanta. The confidential source identified Atlanta as an important center of operations for the Troncoza DTO.

In addition to this information, Phoenix DEA agents who arrested Joy Watson for drug trafficking executed various search warrants and seized approximately 440 pounds of

marijuana in that investigation. A financial investigation of members of the Watson DTO demonsrated three accounts into which Joy Watson deposited U.S. currency that were in the names of J. Troncoza, Drusilla Troncoza and Sea of Cortez Produce & Distribution Inc.[1] A previous investigation by the DEA Cleveland office had established that Jonathan Troncoza was also affiliated by his financial transactions with Sea of Cortez Produce & Distribution Inc.

In December of 2008 police in the Detroit area stopped a semi-tractor and trailer marked Mt. Freight with an Arizona registration. The truck was mostly empty except for two pallets of shrimp from Sea of Cortez Produce and Distribution, Inc. A narcotics detector dog, however, alerted on the exterior passenger side of the tractor trailer and the front left sidewall of the trailer. A review of the records from Jonathan Troncoza's prior phone revealed that he received three telephone calls at or about the time that the truck was detained by Detroit police. And further, as a part of the investigation of Jonathan Troncoza in 2005 DEA agents stopped him in Phoenix and searched his luggage which contained $181,790 in U.S. currency, which he could not explain. He had been previously arrested in Tucson for possession of 252 pounds of marijuana.

It is appropriate to deny a *Franks* hearing where the affidavit, purged of any misrepresentations still establishes probable cause. *United States v. Tham,* 960 F.2d 1391, 1395 (9th Cir. 1992) (affirming the denial of a *Franks* hearing.) Because the affidavit here establishes probable cause even after removing the unverified statements of the cooperating defendant, a *Franks* hearing is not necessary.

**II.    Defendants Do Not Successfully Call Into Question the Necessity of the Wiretap**

The affidavit submitted in support of the application for wiretap identified several known residences for Jonathan Troncoza within the United States. As to one of them, the

---

[1] Although this information may to some extent, coincide with information provided by the cooperating defendant, it was independently verified by law enforcement and Defendants do not appear to challenge it. The Court therefore could appropriately consider it in assessing the validity of the information contained in the affidavit.

affidavit states that "the use of a pole camera installed at 6621 Arbor Bluff Court has been discussed, however after surveying the neighborhood, no poles exist in the area that would give agents a clear view of the residence. Although a pole camera is helpful in watching locations, it is important to note that use of a pole camera alone is not reasonably likely to succeed in dismantling this organization."

Defendants move to invalidate the wiretap because counsel for Garcia avows that his Google Map research "reveals there are several streetlights and poles within close proximity to the residence in question." Even assuming that "there are several streetlights and poles within close proximity to the residence," counsel cannot evaluate from the use of Google Maps whether a pole camera would provide a clear view of the residence sufficiently to impeach the sworn statements in the affidavit. Further, even assuming a pole camera would provide a clear view of the residence, it is not clear how a pole camera on one of several residences of the defendant would obviate the need for a wiretap in this case. Nor do any of Garcia's other non-specific arguments concerning what he asserts to be the adequacy of tracking warrants, confidential sources or other surveillance amount to a realistic challenge to the necessity of the affidavit given the history and the facts that are set forth therein. "Law enforcement need not exhaust every conceivable alternative before obtaining a wiretap." *United States v. McGuire,* 307 F.3d 1192, 1196-97 (9th Cir. 2002), *United States v. Brown,* 761 F.2d 1272, 1275 (9th Cir. 1985).

**IT IS THEREFORE ORDERED** denying Defendant's Motion to Suppress Wiretap Evidence (Doc. 229).

DATED this 18th day of July, 2012.

/s/ A. Murray Snow
G. Murray Snow
United States District Judge